Harold G. LAKEMAN, Appellant,

v.

TREASURER OF MISSOURI, as Custodian of Second Injury Fund, Respondent.

No. WD 52092.

Missouri Court of Appeals, Western District.

June 4, 1996.

**500**

George G. Allen, Jr., Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Mathew Queen, Michael C. Kirkham, Asst. Attys. Gen., Kansas City, for respondent.

Before LOWENSTEIN, P.J., and HANNA and SPINDEN, JJ.

SPINDEN, Judge.

Harold Lakeman appeals the Labor and Industrial Relations Commission's denying him compensation from the Second Injury Fund. We affirm.[1]

On May 24, 1989, Harold Lakeman injured his right shoulder when, while working at Allied–Signal, Inc., a chair tipped over, and he fell to the floor. After missing three days' work because of the fall, he continued working for Allied–Signal until he resigned in 1991. At the time of his resignation, Lakeman had worked for Allied–Signal for 42 years. His duty at Allied–Signal was to track the company's tool orders.

An administrative law judge heard Lakeman's claim against the Second Injury Fund. The only issue before the ALJ and the commission was whether the Second Injury Fund was liable for Lakeman's alleged permanent and total disability. After hearing the evidence, the ALJ concluded that Lakeman was not entitled to benefits from the fund, and the commission affirmed his decision.

In the first of four points, Lakeman contends that the commission erroneously affirmed the ALJ's decision because the ALJ applied the wrong standard. Lakeman contends that the ALJ applied the "industrial disability" standard instead of the new standard established by the 1993 amendment to § 287.220, RSMo 1994.

The proper criteria for determining Second Injury Fund liability is set forth in § 287.220, RSMo 1994. In *Leutzinger v. Treasurer of Missouri*, 895 S.W.2d 591, 592–93 (Mo.App.1995), this court's Eastern District held that the General Assembly's 1993 amendment to § 287.220 superseded the former, judicially-created "industrial disability" standard for determining liability under the Second Injury Fund. For Second Injury Fund liability under § 287.220, the pre-existing injury must be a "hindrance or obstacle to employment or to obtaining reemployment." Section 287.220; *Lane v. Schreiber Foods, Inc.*, 903 S.W.2d 616, 623 (Mo.App. 1995).

In this case, the ALJ analyzed the Second Injury Fund's liability using the "industrial disability" standard which was in effect at the time Lakeman was injured in 1989. Because this case was decided after the 1993 amendment became effective, the ALJ should have applied the new standard instead of the "industrial disability" standard. Nonetheless, we do not discern any prejudice to Lakeman because the commission did not rely on the "industrial disability" standard. It applied the new standard. The commission set out the amended statute in its award and cited *Leutzinger*. After considering the evidence, the commission found that Lakeman's pre-existing medical conditions did not constitute a hindrance or obstacle to his employment.

---

1. This is the second time this case has come before this court. In the first appeal, this court held that the administrative law judge did not have authority to grant the Second Injury Fund's request that Lakeman undergo rehabilitation evaluation or medical examination. *State ex rel. Lakeman v. Siedlik*, 872 S.W.2d 503 (Mo.App. 1994). Lakeman and Allied–Signal settled Lakeman's workers' compensation claim concerning his right shoulder injury in 1994.

■ The commission's decision—not the ALJ's—is the one we review. *Davis v. Research Medical Center,* 903 S.W.2d 557, 569 (Mo.App.1995). We, therefore, find no error.

■ Lakeman next contends that the commission's failure to find that he was totally disabled was against the overwhelming weight of the evidence. Lakeman claimed that he was totally disabled as a result of his 1989 shoulder injury and pre-existing disabilities to his left foot, right knee and hearing. He acknowledges that the Treasurer presented medical testimony by Michael J. Poppa, D.O., supporting the commission's decision, but he contends that it "was so impeached that [it] was not credible." He assigns error to the commission's failing to conclude that Poppa was not credible.

Relying on *Davis, supra,* Lakeman asks us to judge, independently, whether Poppa was credible. He suggests that the "two-step analysis" of commission decisions announced in *Davis* authorizes us to delve into the commission's credibility rulings. He points to *Davis'* summary of how this court should review a commission decision:

> The court applies a two-step process designed to determine whether the Commission could have reasonably made its findings and award upon consideration of all the evidence before it. In the first step, the court examines the whole record, viewing the evidence and all reasonable inferences drawn therefrom in the light most favorable to the award, to determine if the record contains sufficient competent and substantial evidence to support the award. If not, the Commission's award must be reversed. If there is competent and substantial evidence supporting the award, the court moves to the second step, where it views the evidence in the light most favorable to the award, but must consider all evidence in the record, including that which opposes or is unfavorable to the award, tak[ing] account of the overall effect of all of the evidence, and determine whether the award is against the overwhelming weight of the evidence. In doing so, it takes into consideration the credibility determinations of the Commission and, if those determinations as to witnesses who gave live testimony before the ALJ are different than those made by the ALJ, it also considers the ALJ's credibility findings as well as the reasons, if any are given, why the Commission differed with those findings.

*Id.* at 571. Lakeman misses the point of *Davis.* Only a page earlier, this court explained the context for its two-step analysis leading to consideration of credibility determinations: "in reviewing cases where the Commission has reversed the findings and award entered by the ALJ[.]" *Id.* at 570.

■ Here, the commission was not in conflict with the ALJ's findings and award (except for the standard to be applied). Hence, our delving into the commission's and ALJ's credibility rulings would be inappropriate. As the *Davis* court said, "Credibility is *clearly* a consideration for both the ALJ and the Commission[.]" *Id.* at 569 (emphasis added). The law remains that the commission is the sole judge of witness credibility and of the evidence's weight and value. We should not substitute our judgment for the commission's judgment even if we would have reached a different decision. *Lane,* 903 S.W.2d at 617; *Clover v. Quality Plastics Co.,* 898 S.W.2d 609, 611–12 (Mo.App.1995).

■ We find sufficient evidence to support the Treasurer's position that Lakeman was not totally disabled when he quit his job in 1991. The commission was free to accept or to reject any medical evidence to the contrary. *Frazier v. Treasurer of Missouri,* 869 S.W.2d 152, 155 (Mo.App.1993).

Lakeman relies on *Griggs v. A.B. Chance Company,* 503 S.W.2d 697 (Mo.App.1973), to assert that the Treasurer was obligated to present substantial and competent evidence to prove that it did not have liability after a claimant makes a prima facie case. To the contrary, we said in *Griggs* that a claimant has the burden of proof. *Id.* at 704.

Lakeman's last complaint concerns the ALJ's sustaining the Treasurer's objection to portions of Lakeman's cross-examination of Harry B. Overesch, M.D. Lakeman retained Overesch to provide a disability rating and an evaluation. Before the hearing, the Treasurer took Overesch's deposition to question

him regarding his opinion of Lakeman's disability based on his examination of Lakeman and the medical report he prepared in 1991. In the report, Overesch opined that Lakeman suffered only a partial disability. During Lakeman's cross-examination, Overesch said that he now believed that Lakeman was totally disabled. The Treasurer objected on the ground that Lakeman had not given him a report of Overesch's "new opinion" and asked for a continuance. The ALJ later sustained the objection and refused, pursuant to § 287.210.3, RSMo 1994,[2] to consider Overesch's "new opinions."

Lakeman complains that the statute's report requirement "is obviously intended to be complied with by the *person producing* the *witness*, not the other way around." Lakeman overlooks, however, that Overesch was a hostile witness.

Nonetheless, even assuming *arguendo* that the ALJ's ruling was improper, we fail to discern any prejudice to Lakeman. The ALJ found that the Overesch's new opinion as to Lakeman's disability was not credible because Overesch relied solely on the reports of other doctors, some of whom had not seen or examined Lakeman until five years after his injury. Overesch admitted that he had retired in 1992 and had not seen Lakeman since 1991.

■ Lakeman's reliance on § 491.070 is misplaced. As a specific statute governing workers' compensation proceedings, § 287.210 would govern over the more general provisions of § 491.070. *See O'Flaherty v. State Tax Commission of Missouri*, 680 S.W.2d 153, 154 (Mo. banc 1984).

We, therefore, affirm the Commission's award.

LOWENSTEIN, P.J., and HANNA, J., concur.

---

**2.** This statute says, "The testimony of any physician who treated or examined the injured employee shall be admissible in evidence in any proceedings for compensation under this chapter, but only if the medical report of the physician has been made available to all parties as in this section provided. Immediately upon receipt of notice from the division or the commission setting a date for hearing of a case in which the nature and extent of an employee's disability is to be determined, the parties or their attorneys shall arrange, without charge or costs, each to the other, for an exchange of all medical reports, including those made both by treating and examining physician or physicians, to the end that the parties may be commonly informed of all medi- cal findings and opinions. The exchange of medical reports shall be made at least seven days before the date set for the hearing and failure of any party to comply may be grounds for asking for and receiving a continuance, upon proper showing by the party to whom the medical reports were not furnished. If any party fails or refuses to furnish the opposing party with the medical report of the treating or examining physician at least seven days before such physician's deposition or personal testimony at the hearing, as in this section provided, upon the objection of the party who was not provided with the medical report, the physician shall not be permitted to testify at that hearing or by medical deposition."